## BACKGROUND

William Michael Hanrahan is a citizen of Australia and defendant, Itorye Tamar Silver, is a citizen of the United States.  In approximately October of 2003, Ms. Silver traveled to New Zealand where she met the petitioner, began a relationship with him, and lived in Australia until June 13, 2006.  The parties were never married, but have a child together, Sierra Dawn Hanrahan, born March 17, 2005 in New South Whales, Australia, where she remained until traveling with her parents to the United States.

Petitioner alleges that he, the respondent, and the child were taking a trip to the United States, which began on June 13, 2006.  The schedule was for only a 10 week vacation with a roundtrip ticket for the parties to return on September 1, 2006. Respondent alleged that the parties were permanently relocating to the United States and that they purchased a roundtrip ticket because it cost less than a one-way ticket.

Petitioner then stated that once they had arrived in America, approximately one month later, on July 11, 2006, that the respondent left with the child and all of her possessions the place the parties were temporarily staying (New York State), and moved to Tucson, Arizona.  Petitioner returned to Australia to await the return of the respondent and the child.  When respondent did not return with the child to Australia on September 1, 2006, the petitioner, on September 4, 2006, filed an application under the Hague Convention with the Australian Commonwealth Central Authority for the return of the child to Australia.  The Australian Common Wealth Central Authority contacted the National Center for Missing and Exploited Children, and by agreement, the U.S. Department of State facilitated the provisions of Advice for Hague Convention applicants and a District Court action was filed in Tucson, Arizona.

Both the United States and Australia are signatories to the Hague Convention on the Civil Aspects of International Child Abduction. It was established and not contested that the Family Law Act of 1975, Australia, Section 61c at 111b(4)(a) gives both parents responsibility for a child until the child reaches the age of 18 years old.

The petitioner filed an *ex-parte* motion before the District Court invoking the Hague Convention and asked for entry of a temporary restraining order, sought immediate temporary physical custody of child and to schedule an expedited hearing and trial pursuant to 42 U.S.C. § 116014(a).

His petition stated that (1) the respondent by retaining the child in the United States breached his right to custody under Australian law; (2) that he has joint custody rights that he in fact was exercising these rights at the time of the wrongful retention of the child; (3) Australia was the past habitual residence of the child; and (4) that exceptions to the return of the child did not apply. (to be discussed later).

The matter was scheduled to be heard on December 4, 2006 as to the application for a temporary injunction. The petitioner was represented by Kenneth Winsberg and the respondent was represented by Tom Slutes, who is the defendant in the current malpractice action.[1]

The first act of malpractice by Mr. Slutes is reflected by Mr. Winsberg's statement to the Court (page 4). It would appear from Ms. Winsberg's statement that this was not to be a scheduled final hearing. This is bolstered by Mr. Winsberg's statement to the Court that "the matter was set to hold a hearing to determine the merits of the

---

[1] The initial page of the transcripts incorrectly identified the attorneys who represented each party.

petitioner's claim for wrongful removal or retention. We ask that the trial in this matter be advanced at the same time that the restraining order would be heard."

Mr. Winsberg further explained to the Court since his client was there from Australia, he would like to clarify this and have a trial in the matter.  With no objection from Mr. Slutes, the Court concurred, stating that it would like to wrap everything up as soon as possible and get it done today.  There was absolutely no input or objection by Mr. Slutes.  Thus, Mr. Slutes, by not raising an objection to the expedited hearing, and not insisting to only address the restraining order and postpone the trial, which would have given him more time to prepare the case for trial, gave at the outset the petitioner a great advantage which would prove to be catastrophic to the respondent's case.

Mr. Slutes' comments on page 5 of the transcript of Monday December 4, 2006, that he was served Friday, November 24, 2006, after Thanksgiving, did not see these papers until Tuesday of the next week, November 27, 2006, and did not see the client, it would seem, until Thursday, November 30, 2006, he had no time to prepare.  He further stated that although he had witnesses that he would like to call, it was too short of a time to have them there, the only person in the courtroom was in fact respondent's mother. His proposed witnesses were never identified and they were never called as witnesses in the matter.

Certainly, Mr. Slutes could have asked for a continuance in order to get his witnesses there and to more adequately prepare his client.  The fact that the case was listed for simply the restraining order, and not a trial, he did nothing in order to tell the Court of his surprise, or objection to the matter being heard, and especially in lieu of the

3

testimony that followed and the lack of witnesses he complained of, Mr. Slutes clearly erred.

I am certain that all parties, including the court, were well aware that the Convention requires the "prompt return of children wrongfully removed" and they must act "expeditiously" in doing so. Hague Convention, Arts 1(a), 11, 19, ILM. At 1502. However, the desire for a swift resolution cannot outdo an attorney's responsibility to see that the case is properly prepared and that the law is properly applied. In re Application of Adan, C.A.3. (N.J.) 2006 at 381.

There is no question that petitioner and his attorney used the right legal methodology to have the matter heard before the Court, including the restraining order, and there is no question that the District Court had jurisdiction pursuant to the "Hague Convention", 42 U.S.C. § 11601 et seq.

To invoke this law, as the petitioner did, he need only prove or establish that: (1) the home state of the child, the Country of Australia, was a signatory to the Convention; (2) that the country in which the child presently residing is also a signatory of the Convention; (3) that the child had lived previously in Australia, and had not lived in any other jurisdiction for a continuous 6 month period of time, except under circumstances not applicable here; (4) that he was the parent of the child and at the time of either the abduction, or in this case, the wrongful retention of the child in the United States, he was exercising his parental rights.

The petitioner established at trial the paternity of the child, his citizenship and the residency of the child prior to July of 2006, all without objection, and consent as it should have been. He further established that, other than one trip that they took to the United

States in 2004, they continuously lived in Australia until the trip in June of 2006.[2]  As to this, there was no objection or cross examination made by respondent's attorney.

The petitioner further testified that in 2004, when they went back to Australia, they purchased vacant property in August of 2005 at Lake Wonboyn in New South Whales.  It would seem as though the house, although planned, was never built.  The parties then became engaged.

The petitioner then went on to describe his occupation as being a professional outdoor guide and outdoor kayak instructor.

He further testified that at the present time, he had what they called a "residential tenancy agreement" (a lease) for a house at Pambula Beach.  We do not know how long it was for, whether the respondent's signature was on it or not, or whether she had participated in or objected to the lease.  The petitioner did testify that the parties had agreed to stay there for 12 months for business because it was a nice place. (page 14).

Respondent then replied to a question concerning the petitioner wanting permanent residency in Australia.  He stated that she had applied for permanent residency status to stay there, but offered no proof to said application and respondent did not deny or explore this by her testimony.

The document that immediately followed and introduced into evidence had nothing at all to do with her residency requirement, but was a medicare card for the petitioner and the daughter, not for the respondent.  He also testified that the respondent had a medicare card of her own, a temporary one, and never provided it to the Court.  She

---

[2] The previous trip was for him to meet her family and for the respondent to go to her brother's graduation and the fact that she was informing her family that she was planning to permanently move to Australia.

never explained or was questioned about this in examination by her attorney.  He also purportedly presented a "joint power bill" for residence in Pambula Beach, Australia, but we do not know whether in fact it was just in her name alone or whether in fact it had both parties' names.

He also showed a building permit from the Bega Valley Shire Counsel that was purportedly a development approval of a building, which he applied for with the respondent.  However, although he said they both applied for it, we do not know whether or not both names were on it or only his, or the date of this application, and why no action was taken to continue this project.  All of this evidence was admitted without both objection and examination.  Petitioner also showed both a joint bank account and joint mortgage, which would establish residency and ownership in Australia.

The petitioner then testified that the respondent first taught full time and then was a "part time casual school teacher."

The petitioner further, without objection, was led by his attorney to produce a document and it was his attorney that basically testified.  He stated "so this document then is to presumably illustrate that you had intention to remain there, that you were looking at additional outdoor recreation, outdoor type of businesses; correct?" (T20-24 to 21-3).  He further, without evidence, went in concerning a business that they were "trying to develop", but it would seem as though this was all prior to her deciding to move back to America.  No objection was made and it was entered without objection, without cross examination, and without explanation on behalf of our client.  Only the Court clarified that it was in the year 2004 and that it was an ongoing business at the present time, but it

was "shut down" in order for him to come to the United States.  (Later on we find out that in fact it was put up for sale when they came to the United States).

As to the present trip to the United States, the petitioner said that they started out for June 13, 2006, with roundtrip return tickets on September 1, 2006 to come back in order to be at his cousin's wedding and to resume the business.   He denied that there was an intention or "definite plans" with respondent to immigrate from Australia to the United States.  He stated that he did not have the ability to work in the United States lawfully at that time and had a limited Visa.  No cross examination was done as to temporary accommodations, green cards, etc.

He then testified as to his involvement with their child, Sierra, regarding bottle feeding her, being involved in her medical treatment, care, inoculations, and his consistency in being with the child except when he was working.  No cross examination was done on his limited involvement or direct testimony presented by the respondent.

He returned to Australia on July 19th while the respondent and the child stayed in the United States.  He stated that although the respondent supposedly disappeared on him and took all the belongings, she told him that she was going to return to Australia and would be back in time for the wedding.  No cross examination was done as to these allegations, nor was there any direct testimony to refute that fact.

He further testified that when he inquired on August 31st as to when he should pick her up at the Sydney Airport, she told him do not bother because she was not coming back - - as though this was the first time he was ever so informed.

When exhibits were entered into evidence by the respondent's attorney, including hearsay emails, Mr. Slutes admitted to the Court that:

> Frankly, I, because of shortness of time, I have some emails
> and other evidence myself I need, and may have the Court
> consider, so I don't feel too strongly about keeping this out,
> but I need to have some of the same consideration when I
> refer to documents that I have not had a chance to get the
> witnesses here for.
> [(T40:6 to 13)]

That having been said, the Court admitted all the evidence, including the hearsay emails.

The Court then began questioning the respondent and got more admissions, as it would turn out, from the respondent, than her attorney would subsequently. The Court had the petitioner admit that it cost the same amount of money for a roundtrip flight as it would for a one-way flight.

During further examination by his attorney, and in the respondent's Affidavit, it became evident that she believed: (1) she came to the United States to get her Master's Degree, (2) began sending personal items to California where her mother lived, and (3) that the petitioner was going to accompany her. (page 42). The petitioner also admitted to his own attorney that they talked about moving to the United States after a 5 year plan in Australia and after they had made some money. Thus, it might have became a 3 year plan where the respondent would get her Master's Degree and where he would find a job that was suitable for him while he was here. This 5 or 3 year program began in 2005. No cross examination of this concept or direct testimony of the respondent was presented.

It was also elicited that they bought a piece of property in 2005, in which the respondent invested $86,000 and the petitioner invested $15,000. On January 17, 2006 (about 6 months before they came to the United States), the property was listed for sale with a real estate agent. The defendant said in her certification that she was putting it up

for sale because she was going to move back to the United States to receive her Master's Degree.

The petitioner admitted that they put the property up for sale in January but rationalized it was not an intention to go to America, but rather a plan to have enough money. Petitioner further admitted if they did not sell it and if they kept the land, they would have to move into a mobile home instead of a house.  Petitioner stated he was surprised when respondent and her mother, who was over for a visit, gave her a listing to sign the house for sale.  He signed it anyway, and he stated that he did so because the price requested was more than it was worth and it would not sell anyway.  He further admitted that most of the monies were respondent's anyway, and that he had previously agreed that by having a baby, starting a business, and buying the land, was too much to handle at one time. (45-46).  There was no cross examination as to this matter and no direct testimony by the respondent.

Petitioner also sought to contradict the statement in she made in her affidavit, namely, that they were planning to move to the United States so they both applied for a Consula Report and an Australian passport.  She further stated that he applied for that, not because he expected to move, but so that Sierra could have dual citizenship and because "she also wanted it as a momentum of a baby photo and passport, you know, for the memories."  Petitioner denied that was part of the joint plan to move to the United States.  This matter was never explored any further nor cross examined nor brought up at all by respondent's attorney.

She also stated that in May of 2006, according to her affidavit[3], they put up his business for sale for approximately $85,000 and it had cost $32,000, which he has now dropped down to about $50,000.  Petitioner, in contradiction, testified that it was not his intention to move anywhere but simply to make a quick dollar.  He denied, of course, that it had anything to do with a potential move to the United States.  He also admitted that there was a garage sale of their items before they left, but rationalized it by saying that the respondent had told him she was only doing it to get a few "extra" spending dollars before they left.  He basically admitted that only a few items were left behind in Australia, but stated that they still had the home which they were unable to sell in Australia, Sierra's crib, kayaks, and some other possessions, but there was "no plan to move to America."  In fact, there was furniture there and other items.  There was absolutely no cross examination and no affirmative testimony.

The attorney for the respondent then began questioning the petitioner as to whether or not he had ever been physically abusive to the respondent, described physical situation where he denied any violence but simple pushing, and stated she was being abusive and erratic. He admitted that the police were called on the 10th or 11th of the month, but insisted that he made love twice that week to her and everything was just "going along just swimmingly." He further admitted that she left the residence, but the date is unclear.  This actually took place in the United States because she made comments about going back to Australia after this happened.  He said that the trip to the United States was "conditional" and there was never any specific intention between himself and

---

[3] All of this affirmative testimony on behalf of the respondent only came into evidence because of the questioning of petitioner by petitioner's attorney and by no one else.

the respondent, and that they would change their habitual residence from Australia to the United States.

Respondent's diary that supposedly showed how happy they were together was also entered into evidence with no objection.

During cross examination, he admitted that he had his business up for sale since May of 2006, but rationalized it by saying that it was up for sale ever since he started it. He stated he set up numerous outdoor businesses in the past and he sold them by way of making a profit as he was looking for a way to make more money.

Mr. Slutes apologized to the Court at this point because he "didn't have a chance to mark exhibits". Mr. Slutes then cross examined the petitioner about the ad that he put in the paper to sell his business. It is very telling because he stated:

> Price slash, save yourself all the work and time, walk straight into this established business, next in the overhead, nothing needs to be done" and stated also "owner moving overseas, very reluctant sale.

This in itself certainly goes very strongly to the intention to immigrate. The attorney, rather than asking him to explain what it meant and stressing about moving overseas, suggested the answer to the petitioner that it was simply a con job for the customers, in order to take advantage and play on that situation as much as he could have. He stated that he was "either kidding potential buyers" or kidding the court now. This approach was lame and completely undermined him. It could have been much stronger, more emphatic, and not suggestive of the answer. At this point, Mr. Slutes could have "gone in for the kill" and completely destroyed petitioner's case, but he did nothing.

When the attorney tried to get additional hearsay information into evidence, he was precluded from doing so, and he commented:

> That's why I'm concerned about this hearing coming up
> about 4 days after I get the case.  I have little time to do it.
> They've had 2 months to get their case together, get their
> exhibits all nicely marked and put into evidence.  I'm doing
> the best I can on 4 day's notice, including weekends, to get
> something before the Court.
> [(T68:12 to 19)].

When Mr. Slutes was questioned about a witness that he could not produce and emails that he could not enter into evidence, the Judge suggested that he ask him whether or not he said certain things that were in emails, specifically, whether he was going to go to America to make a "go of it".  This approach minimized the point, and this kind of an admission would have been a much more effective, and maybe even compelling, if supporting witnesses had been presented either in person, by telephone, or by Skype.

Again, when the attorney tried to present other hearsay evidence, rather than a witness concerning the garage sale, the Court itself admitted that it was "pretty far fetched hearsay Mr. Slutes."  (T70:23 to 24).  Rather than producing Adel Fenico, a friend of respondent's from New York, he attempted to question the petitioner about conversations that they had, which he easily denied.

Then, Mr. Slutes tried to present the violent nature of the petitioner, that he was drunk, violent, threw a carabin at her, urinated on her bed, pushed her, etc.  He did this by cross-examination and the petitioner presented no testimony by respondent or any other witnesses.  He did not present police reports, etc.  Without the witness being available, it was very easy for the petitioner to deny these events and put his own spin on it. This would seem to have happened in Lake George and be the precipitous act before the parties separated in America and when she refused to go back with him to Australia.

12

On direct examination, the petitioner discussed her move from Australia and her plan to move in January of 2006 back to the United States by putting the property back on the market.  She further stated that they planned that petitioner would work here by taking people hiking on the West Coast and talked about his dream to be a Heli Ski Guide, which he could fulfill here in this Country.  She further testified she wanted to be close to her family and go to graduate school in the West and had looked at Master Degree programs like Berkeley, UCLA; it was near Mamoth, which itself was close to the Canadian border. She stated she could also get her Master's in Educational Psychology possibly in Washington State.  She further testified that she considered to come here, not just for a vacation, but planned to find a school and for him to find a job. These statements were short, and not elaborated upon, nor were there any other proofs given as to this intention to immigrate.

## HAGUE CONVENTION LAW

This matter involves the representation of the attorney Tom Slutes, Esq., and whether or not he committed malpractice in his representation of Itorye Tamar Silver, in her defense what can only be characterized as her wrongful retention of their infant child, Sierra, in the United States and her refusal to return the child to Australia.  The Hague Convention on the Civil Aspects of International Child Abduction was signed by the United States on October 25, 1980 T.I.A.S. §11670, 19 I.L.M. 1501 (1980).

Petitioner began the action properly with the Central Authority of Australia, bringing the action before the United States District Court, the District of Arizona, by means of a temporary restraining order and for a hearing before the Court.  The District Court of Arizona had jurisdiction of this case under 28 U.S.C. § 1331, as it is a civil

action arising under the laws of treaties of the United States, and 42 U.S.C. § 11601(3)(a), which grants State and Federal Courts "concurrent original jurisdiction of actions arising under the Convention."

The Hague Convention was adopted and instituted in the United States by passing the International Child Abductions Remedies Act, 42 U.S.C. § 11601, et seq.  As stated, the purpose of the Convention is to "protect children internationally from the harmful affects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for their rights of access."  Hague Convention, preamble, 19 I.L.M. at 1501; see Yang v. Tsui, 416 F. 3d 199, 201 (3d Cir. 2005).

Under Article 3 of the Convention, removing a child from a country is wrongful when: (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Under the Hague Convention, an applicant seeking return of a child must demonstrate by a preponderance of evidence that he or she had and was exercising custody rights over the child under the country of origin's laws and that the country of origin was the child's habitual residence.  42 U.S.C. § 11603(e)(1) (2000); Feder v. Evans-Feder, 63 F.3d 217, 222 (3d Cir. 1995).

14

There is no question that these provisions were met by the petitioner and he had every right to bring this action before the Court and that in fact the Arizona Court had jurisdiction to handle the matter.[4]

Once the provisions are established, the burden then shifts to the party that wrongfully removed the child to show by clear and convincing evidence that certain exceptions apply either under Article 13(b) or under Article 13(a). A petitioner in an action under subsection (b) shall establish by a preponderance of evidence that the child has been wrongfully removed or retained and a respondent who opposes the return of the child has a burden by clear and convincing evidence that one of the exceptions set forth in Article 13(b) or 20 of the Convention applies.  There are two other exceptions, one of which does not apply to this case, and the second one does.[5]

Article 13(b) states that an individual is not bound to return the child, if in opposing it establishes that "there is a grave risk that his or her return will expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

Article 13(a) would not apply in this matter and it was uncontested that the petitioner was exercising custodial rights at the time of the removal.  42 U.S.C. § 11603(e)(1) (2000) and 11603(e)(2)(A)(B) (2000), further, 63 F.3d at 222; the child is over 16 years of age, etc.

---

[4] Although one could argue that the petitioner's return to Australia was an abandonment of the respondent and the child and he, at that time, ceded his parental rights.

[5] Other affirmative defenses that also do not apply proof by a preponderance of evidence that the child is now settled in her new environment and that the petitioner did not begin proceedings for return of the child after one year had expired following the wrongful removal of the child.  42 U.S.C. § 11603(e)(2)(B).

Besides Section 13b, the grave risk defense, the most important of all of the affirmative defenses, and is the one that should have been stressed the most and prepared for the most, but was not. As a result of the attorney's malpractice, which in itself resulted in the denial of the respondent's application or to dismiss the action and allow her and the child to stay in the United States, is that she could have proven by a preponderance of evidence that the respondent "had consented to or subsequently acquiesced to the removal or retention of the child." 42 U.S.C. § 11603(e)(2)(B)  Hague Convention Article 13a.

Thus, the defenses in this matter were left to two, neither one of which were prepared, documented or fully litigated before the District by respondent's attorney. Those two again are Article 13b exception grave risk and, most importantly, 13a the fact that the petitioner had consented and planned and acquiesced to the removal to the United States from Australia.

Once the burden has shifted to respondent, application of the legal standard must be compared to the historical and narrative facts which must be presented in an organized and cohesive manner before the Trial Court, not only to try to convince that tribunal of the correctness of the respondent's position, but to set forth basis and in case of an adverse decision in the District Court to petitioner and to show the Appellate Division that the court's decision is an erroneous interpretation of the legal precepts and the application of these precepts to the facts.  Baxter v. Baxter, 423 F.3d 363, 367 (3d Cir. 2005).  In an Appellate Court, once these matters are set forth under the Convention, a District Court's determination of the facts is reviewed for clear error and its application of those facts to the law, as well as interpretation of the Convention, are reviewed *de*

*novo*.  See Blondin v. Dubois, 238 F.3d 153, 158 (2d Cir. 2001) (Blondin ii); Shalit v. Coppe, 182 F.3d 1124, 1127 (9th Cir. 1999); Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996) ("Friedrich II").

At the trial, the attorney for the respondent did not raise any challenges to petitioner's standards, methodology of bringing the action, and exercising of custody. There could have been an argument made because petitioner had abandoned the family and went back to Australia in late July of 1996, that he abandoned the family and his co-custody rights.  It probably would not have been an effective position under the circumstances of the case.  Thus, the initial prerequisites for standing and jurisdiction, which have made namely that he was exercising his custody rights were never challenged before the Court.  The attorney for the petitioner rightly established before the Court that the petitioner had custody rights under Australian law, because the Convention calls into play the initial custody of the child, and the laws of that jurisdiction, to determine whether the party seeking the child's return had custody.

Thus, the issue then changes to the question of habitual residence.

The determination of habitual residence "is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case". Whitting v. Krassner, 391 F.3d 540, 546 (3d Cir. 2004).  When a child is too young to have an intent regarding her habitual residence, the touchstone inquiry is 'shared parental intent.'" Id. at 548.  As was explained in Feder, supra, "[a]ll that the law requires is that the [person] intends to stay where he is indefinitely.  Indeed his purpose while settled may be for a limited period.  Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of

regular abode, and there may well be many others.  All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled."

The question of original habitual residence, before the move to the United States, was certainly proven by the petitioner by a preponderance of evidence that Australia is the original country of habitual residence.  The fact that the petitioner lived there for a period of time, had a child there, worked there, and had family there and stayed there, with the exception of one brief visit to the United States in 2004, established Australia as the original "habitual residence".

However, then came the move to the United States and the fact that all 3 parties by the respondent's certification, but weak presentation before the Court; could have strongly established habitual residence of themselves and their child in the United States.

All of respondent's family is from the United States, whether New York State, Arizona or elsewhere.  She told of her desire to get her Master's Degree in the United States, rather than anywhere else, because she was "a snob" and she believed we had better educational systems.  She described her initial search for a graduate school while she was in Australia. The only way that she could have done so was by the internet, and admittedly did not, at that time, send for any kind of application or brochures from the school.

Ill prepared for cross-examination, but not strongly enough, she further discussed her initial desire to live with her fiancé on the west coast, possibly Washington State near the Canadian border, so that the petitioner could fulfill his dream of being a Helicopter Guide and she could pursue her educational career.

A much stronger and better case could have been made under these circumstances to show that the parties had a "settled purpose" and "shared parental intent" to raise their daughter in America, and to establish that it was their intent for the United States to become the child's habitual residence.

The facts of the abandonment of the party's ties with Australia could have been more strongly emphasized and the witnesses could have been brought in in order to underline their determination to abandon Australia and establish a permanent residency in the United States.

The fact that it seems they were abandoning everything in Australia was not adequately stressed, testified to, or established by testimony or other extraneous evidence.

What we do know from the limited presentation is that the parties listed their property for sale, listed his business for sale stating that he was basically emigrating to the United States, had a garage sale as to all of their personal items, packed up their clothes (the petitioner even commented about having to repack because of the amount of clothes), the attorney for the respondent did not have his client adequately testify to these matters, have supporting testimony, or explain the rationalizations of the petitioner for his actions. (He testified he was kidding the potential buyers for the sale of his business; that the land would not sell at that price so he didn't care if it was listed; that he left clothes including the child's crib which she had probably outgrown in Australia).   In re-direct, none of this was directed at the petitioner.

## ARTICLE 13(b) EXCEPTION

The second strongest defense is the Article 13(b) exception of grave risk escaping a situation in distress out of other countries, legal or illegal, to protect yourself or your

child and not being compelled to return.  The attorney for the respondent did not present an adequate case of the facts, and presented limited evidence of grave risk of harm to Sierra, and to the respondent, if they were forced to return to Australia with the petitioner.

## GRAVE RISK

The Convention's Article 13(b) exception is "narrowly drawn."  See Feder, 63 F.3d at 226. "Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement-namely, to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" Blondin v. Dubois, 189 F.3d 240, 246 (2d Cir. 1999) ("Blondin I") (quoting Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993) ("Friedrich I")); see Baxter, 423 F.3d at 367 (stating "[T]he Convention's procedures are designed to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases.").  The U.S. State Department has explained that "intolerable situation" is not intended in every situation, but if a parent retains a child to safeguard it, (there was no testimony of any child abuse) or herself, as the custodian of the child from an abusive parent, a petition for a child's return under the Convention can be denied by the Court.  Such action would protect the child from being returned to an "intolerable situation", and either the child or parent prevent the child and/or parent from being subjected to grave risk or psychological harm.  Hague Convention Analysis, 51 Fed. Reg. at 10,510; Baxter, 423 F.3d at 373 (same); see Blondin II, 238 F.3d at 162.  This exception includes physical or psychological harm, which they would be subjected to  as

the result of repatriation, but not situations where repatriation might cause inconvenience or hardship, or to eliminate certain educational or economic opportunities, etc.

In this instance, the respondent inadequately presented at court as to the intolerable situation and the grave harm that would be done due to herself if she was to return with the child to the father to Australia.

Also, it could have been established, if in fact, it was true, that Australia, the country of habitual residence, for whatever reason could be incapable or willing to give both her and the child protection.  Blondin II, 238 F.3d at 162 (quoting Friedrich II, 78 F.3d at 1069).

At trial, respondent also hinted at times she had lived in isolated areas with few people, cut off from most of the mainland in Australia by distance in hours.  The presence, or lack of presence of police, could have been a factor to consider if domestic violence had been established; Australian attitudes towards domestic violence and their possible chauvinistic attitudes towards the protection of women, etc., all could have been presented.

Because it was not sufficiently explored, the Court paid no heed to any of the physical violence alleged which is evidenced by the fact that transferred custody of the child to the petitioner, and made no "accommodations" in order to protect the child or the mother once the child was ordered back to the United States.

There was no exploration as to what conditions they were returning to or whether authorities were capable of safeguarding the child or the mother.  There was no order entered that would take into account if there were any risks or harm which would exist, nor an order that would reduce or eliminate risks of harm that might otherwise be

associated with granting the petition.  Although by the certification and the re-testimony, it was obvious here that it existed.  Blondin I, 189 F.3d at 248-49.

The fact that it was not brought adequately before the Court is evidenced by the fact that when the District Court made its determination, it did not make any statement as to the demeanor or truthfulness of either one of the witnesses.  To the Court, this issue was not in controversy.  There was no comment made on the quantum of the evidence presented concerning either the switching of the habitual residence or the grave risk of harm, because an adequate case was not presented to the Court.  The findings of the Court are very telling in the Court's original order in it removed the child from custody of the mother and gave temporary custody to the father, while directing the Convention applied, with no evidence presented.

The Court concluded that the trip to the United States was simply a visit and a ten week stay, and not immigration or permanent change of residence.

The Court refers to domestic problems, yet again fails to emphasize the magnitude of the problem, or the potential danger to the respondent or the child.

The Court mentions the petitioner moving back to Australia, but does not explore whether this amounts to abandonment, make any determinations or observations as to the credibility of either party.

In its determination, the court stated that the petitioner had not consented to or subsequently acquiesced in the removal or retention of Sierra from Australia, (Article 13(a)), the court based its decision on the sole fact that the parties bought a roundtrip ticket returning to Australia on September 1, 2006.  the court arrived at this finding

despite the fact that both parties admitted that a one-way ticket was just as expensive as a roundtrip ticket, and with a roundtrip ticket, that return date could be changed.

The Court ignored the grave risk of harm to the child as an exception because "the defense fails and is inapplicable because no credible evidence was presented that Sierra will be physically harmed by William or that William will subject Sierra to psychological harm." There was no mention of domestic violence actions against the respondent in that decision, and only mentioned offhandedly in the preamble which states "during the trip to the States, William and Itorye had some domestic problems which led to both Itorye and William filing orders of protection against each other." The lack of exploration of this is evidence of the poor presentation that was made of this issue before the Court. The harm to the mother by the father, not directly on the child, still creates a grave risk. In Walsh v. Walsh, 221 F.3d 204, 220 (1st Cir. 2000) the court held that such evidence is relevant when considering whether a grave risk of harm to a child exists because "credible social science literature establishes that serial spousal abusers are also likely to be child abusers" and "both state and federal law recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser." In the case *sub judicia*, the court in fact was not given the totality of the evidence of abuse against the respondent by the petitioner in order to make a careful analysis.

The decision also includes a thinly masked reprimand by the Court against Mr. Slutes when it says, on page 6 of the decision:

> The Court has considered the respondent's motion to reopen evidence that was filed by Mr. Slutes as well as the response filed by petitioner's counsel. During the hearing, the Court specifically explained its purpose. Therefore, the

court finds that each side had a chance to fully present their positions" and thus rejected submitting of any evidence since its final nail in the coffin.

In his summation, the respondent's attorney was cogent, organized, and knowledgeable of the issue.  He asked the court to conclude that the petitioner never acquiesced in the child staying in the United States, pointing to the fact that the only testimony of the only third party witness presented was petitioner's mother, and the fact of roundtrip tickets.  (page 47).  The petitioner's attorney also stressed that the grave risk exception to the Hague Convention did not apply.  No such evidence was presented to the Court.  (T148).

In his closing before the Court, Mr. Slutes once more acknowledged that the prompt scheduling of the hearing caused him to be "a little hamstrung on evidence." (T152 to 155).  He also said that he could have produced witnesses, or presented affidavits, depositions, and would have enforced respondent's testimony that their intent to immigrate to this country, which he called a "change of residence."

Although petitioner's attorney raised the question of credibility as to their intent at time of his closing statement, none was commented on by the Court as set forth above.

The only case which respondent's attorney cited at time of his closing arguments was one dealing with the best interest of the child, Steffen F. v. Severina P. D.Ariz, 966 F. Supp. 922 (1997) he stressed the benefits of the child to stay here in the United States, the best interest of the child to stay in the United States, which this Court was prohibited from considering. In this case, a psychologist could be presented as a witness to show that taking away a one year old child from the mother who had just finished or was still breast feeding the child, would have an adverse and detrimental affect upon the child.

24

## CONCLUSION

Although there can be no certainty that under the best of circumstances, Ms. Silver would be allowed to stay in the United States. It is my opinion that Tom Slutes, Esq. and his handling of the case, <u>William Michael Hanrahan v. Itorye Tamar Silver</u>, docket number DV06-580, TUC-RCC, committed legal malpractice which was the direct and causal relationship to the loss of the respondent's defense of this case.   Any subsequent doing would have prevailed in her defense of the petition for removal, without an adequate, prepared defense, by an attorney who knows the intricances of the Hague Convention and she did not have a chance of success because:

(1) He did not adequately provide himself with time to prepare the case.

(2) He allowed the entire case to be tried when it was scheduled for hearing on the injunction until final hearing; and because of which he was ill prepared to prepare his exhibits and briefs, and prepare and present vital witnesses before the Court.

(3)  It is obvious that he had little knowledge of the Hague Convention law as to what issues were pertinent and which issues had to be emphasized, without which he could not stress the important points, instead of the "best interest of the child", and this he did not adequately present the defenses that were available to defeat the petition.

(4) He failed to present any witnesses by phone, Skype, affidavit or otherwise to bolster his client's position and to oppose those of the petitioner.

(5) He inadequately failed to prepare his client and illicit information from her at time of trial as to the essential matters of relocation and physical abuse.

(6) He inadequately failed to present evidence of the risk of harm that the respondent would have to face if she returned to Australia, as well as the possible inability of a local police station to protect her or the child.

All of the above, whether individually or collectively, caused a relationship to the loss of the case, the failure to defeat the petition for return; and any consequential expenses that followed.

Respectfully submitted,


ELLIOT H. GOURVITZ

EHG/kh