Philip J. Nathanson    Arizona State Bar #013624
THE NATHANSON LAW FIRM
8765 E. Bell Rd. – Suite 101
Scottsdale, AZ  85260
(480) 419-2578
(480) 419-4136

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| ITORYE TAMAR SIVLER,<br><br>           Plaintiff,<br><br>TOM SLUTES and SLUTES, SAKRISON &<br>ROGERS, P.C.,<br>           Defendants. | No. 4:08-cv-00640-FRZ<br><br>**PLAINTIFF ITORYE SILVER'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.**<br><br>Assigned to: Hon. Frank R. Zapata |

Plaintiff, ITORYE TAMAR SILVER, by and through her attorney, PHILIP J. NATHANSON of THE NATHANSON LAW FIRM, submits her Response to the Defendants' Motion for Summary Judgment and the Rule 56 materials filed by defendants.  For the reasons set forth herein, as well in plaintiff's factual materials, the motion should be denied in its entirety.

### MEMORANDUM

This is a legal malpractice case.  Plaintiff's expert witness has produced two expert reports and given a deposition.  Defendants do not challenge the expert's standard of care testimony in their motion for summary judgment.  Instead, defendants premise their summary judgment motion on defendants' view that plaintiff cannot prove proximate cause.  Thus defendants argue that plaintiff cannot prove that she would have prevailed in the Hague Convention case if defendants had performed as trial counsel as they should have performed under the standard of care.  Perhaps that is because defendant Slutes failed to object to the TRO hearing being converted into the trial on the merits of the case, two weeks after the filing of the Hague case, without plaintiff having the benefit of discovery and trial preparation.

The fundamental fallacy of defendants' proximate cause premise is defendants' claim that plaintiff must prove to a certainty that they would have "necessarily" prevailed at the Hague Convention trial but for defendants' negligence.  However, no such certainty is required in a civil case in Arizona alleging professional negligence.  Rather, plaintiff must prove proximate cause according to the burden of proof in civil cases: "more probably true than not true."  (RAJI (Civil) 4th, Standard 2, at p. 23.  Plaintiff must prove the "case within a case," namely, that she would have prevailed in the Hague Convention case absent defendants' negligence.  But plaintiff's burden is satisfied if she proves that proposition is "more probably true than not true."   Plaintiff's expert witness testified in his deposition that if the evidence "**was presented properly, that there was a probability that she would have been successful.**"  (Pltf. SSOF, ¶43)(emphasis added).  That expert evidence, by itself, should defeat this summary judgment motion which is premised upon the alleged lack of proximate cause evidence.

After the deposition of plaintiff's expert, plaintiff deposed defendant Slutes, and the Australian court issued its decision on the custody matter in Australia.  Plaintiff's expert witness, after reviewing the decision of the Australian court, and the Slutes deposition, issued a supplemental expert report relying on those newly available materials (Gourvitz Supplemental Report, Pltf. Ex. #5, at p. 11).  Plaintiff's expert rendered additional opinions on proximate cause in his supplemental expert report:

> "… In my original report, I mentioned, and did dwell upon, the issue of where the child's "habitual residence was", which would be central to the determination of which Court would have jurisdiction because all of the information that was presented and reviewed by me as set forth above did not raise that as an issue. Under the Hague Convention, all that is necessary in order to prove habitual residence is that the parties have approached living in Australia with sufficient degree of continuity to be properly described as settled.  There is no bright line defining the amount of time or the circumstances under which a person becomes settled and a place becomes a party's habitual residence.
>
> **A review of the above documents, including mostly the decision of the Australian Court in Ms. Silver's favor (as will be described below), is the finding by the Trial Judge in Australia that in fact Australia was not the habitual residence of the parties for reasons set forth below**.  **These same statements, exhibits, and evidence could have been produced to the District Court Judge. That was convincing to the Australian Family Court Trial Judge which could have been just as convincing if presented to the Arizona Federal Court Judge.** If this information as described

below was presented, Mr. Hanrahan may have been excluded from his action because of the lack of 'habitual residence of the child.'

Although I opined in my original papers that there was no exploration at the Federal trial of the parties "settled purpose" and "shared parental intent" to raise the daughter in America and to establish that it was their intent for the United States to become the child's habitual residence, the subsequent decision of Judge Cohen in Australia that there was no habitual residence in Australia and that the parties purpose was to emigrate to the United States shows that the information was available, but simply not elicited." (Gourvitz Supplemental Report, Pltf. Ex. #5, at p. 6)(emphasis added).

That supplemental expert evidence, either alone or in combination with plaintiff's initial expert report and the expert's deposition testimony, defeat this summary judgment motion arguing proximate cause.   That supplemental expert report discusses at great length the resulting effect of defendants' failure to adduce the information in Tucson at the Hague Convention hearing that was adduced in Australia at the custody trial there.  The 26 page supplemental expert report precludes summary judgment, along with the facts discussed in that report and in the Australian court decision.

## STATEMENT OF FACTS

Plaintiff, ITORYE TAMAR SIVLER, began her career as a school teacher in September of 2001. Plaintiff met her child's father, Mr. Hanrahan, on a trip to New Zealand in late 2003. Initially, Plaintiff and Hanrahan worked together in New Zealand.   After Plaintiff and Hanrahan left New Zealand, then first came to America and then they decided to be in Australia "for awhile." (Pltf. SSOF, ¶1-3).    The daughter of Plaintiff and Hanrahan, was born on December 13, 2005.  She lived with her parents in Australia until they came to the United States in 2006. Plaintiff and Hanrahan stayed in New York with plaintiff's family until July of 2006 when Plaintiff came to Tucson after Hanrahan  left New York and returned to Australia, to find a job in Tucson because plaintiff's mother had property in Tucson (Pltf. SSOF, ¶4-8).  In August of 2006, Plaintiff came to Tucson to find a job, which she found at Southside Community School in August 2006, several blocks from where her mother was living (Pltf. SSOF, ¶9-10).

Hanrahan filed the Hague Convention case in late November of 2006.   Plaintiff initially retained another attorney before defendant Slutes, but then had the retainer she had paid to the other attorney transferred to Slutes when Slutes told Plaintiff that he had a team of people working on the case and that he felt he had a strong defense (Pltf. SSOF, ¶12-13).   Plaintiff met with defendant Slutes on November 30, 2006, and then met with Slutes' partner, Kathleen Rodgers, on December 1, 2006.  Also on the latter date, Slutes met with plaintiff and prepared an affidavit for plaintiff  in opposition to the Hague Convention case.  Plaintiff gave Rodgers her paperwork and evidence in that December 1st meeting.

Plaintiff was not told by defendant Slutes at their December 1, 2006, meeting that the upcoming December 4, 2006, was going to be a hearing like the hearing that transpired.  She was told it was a "technicality" and the judge would just give another date for the case at the December 4, 2006, hearing.  Defendant Slutes told her the December 4, 2006, hearing was not going to be the hearing where the Hague case was decided.  Plaintiff was not prepared to give any testimony of any kind for the then upcoming December 4, 2006, hearing.  The last time Plaintiff met with defendant Slutes, before the December 4, 2006, hearing, was at their December 1, 2006, meeting  (Pltf. SSOF, ¶14-16).

When asked what defendant Slutes failed to do, Plaintiff testified that he was not prepared for a full-blown hearing;  he did not prepare her to testify;  he did not cite any case law other than the case suggested to him by Plaintiff and he raised the best interest of the child standard which is not the standard in a Hague case.  Two days after the December 4, 2006, hearing, defendant Slutes filed a motion to reopen the evidence.  Plaintiff testified that had she known the December 4, 2006, hearing was going to be a full-blown trial, she would have wanted the witnesses called who were listed in the motion to reopen the evidence.  Plaintiff believed it was not emphasized that when the child is as young as this child was, then the habitual residency

was the location of the primary caregiver (Pltf. SSOF, ¶17-18).  Defendant Slutes admitted that he did not believe that the exceptions to a Hague convention case applied.

Plaintiff believed there were additional witnesses in Australia who should have been called for Plaintiff who knew about the nomadic nature or her relationship and the discussions between Plaintiff and Hanrahan about moving to America.  Additionally, both of her stepfathers and other family members and friends in New York should have been called as witnesses  to discuss the rocky relationship and what had occurred in New York while Plaintiff and Hanrahan were there.  Plaintiff told defendant Slutes about these other witnesses prior to the December 4, 2006, hearing.

Slutes did not object to the case going forward as a full trial on the merits at the first hearing in the case, two weeks into the case, on the motion for a TRO.   Slutes did not call as witnesses the Plaintiff's family members who were present in the courtroom.  Hanrahan's mother was called as a witness at trial (Pltf. SSOF, ¶19-20).   Slutes did not argue or offer evidence on the grave risk exception, even though Hanrahan was abusive towards Plaintiff, and could not properly care for their daughter (Pltf. SSOF, ¶20-21).   Slutes admitted that "he would have never thought" to raise the harm to the child exception (Pltf. SSOF, ¶30).

Slutes testified that  he was served with a Motion for TRO.  Defendant Slutes filed a Response to the Motion for TRO, but did not answer the Hague Petition.   Slutes knew there was a chance the December 4, 2006, hearing would go beyond the Motion for TRO into the merits of the case and the hearing of evidence.   On December 4, 2006, the clerk called the case as coming on to be heard on the motion for TRO.  Counsel for Hanrahan announced that he wanted the trial of the whole case heard on that first hearing for a TRO, a couple of weeks after suit was filed.  Defendant Slutes did not object to the whole trial being heard on December 4, 2006 (Pltf. SSOF, ¶31-34).

After Judge Collins' December 8, 2006, ruling, Defendant Slutes told Plaintiff that she had 15 days with her daughter, Sierra, after Judge Collins' December 8, 2006, ruling.  But Slutes did not tell her to refrain from handing over the passports or the child until any ambiguity was resolved regarding the order.  It appeared that the second order, which referred to "custody" contradicted the first 15 day order.  The second order and confusion resulted in Plaintiff being denied access with her child.  On December 12, 2006, Slutes filed a motion to clarify the December 8, 2006, order.  And in that motion, Slutes said it was his understanding that the intent of the order was to allow Plaintiff to have custody for 15 days and then turn the child over to Mr. Handrahan who would then have custody of the child and return to Australia.  Then the motion says, unfortunately, the attorney for Mr. Handrahan  interpreted the order as saying Mr. Handrahan was entitled to immediate custody and he so instructed his client.  And as a result Mr. Handrahan, over the weekend, told Ms. Silver that he wanted to see the child for one hour and then  refused to give the child back claiming he was entitled to custody (Pltf. SSOF, ¶22-23).

On December 10, 2006, Mr. Hanrahan took Sierra for what he told Plaintiff would be a short picnic, and instead he fled the State of Arizona along with his mother and Sierra.  That Plaintiff discovered that Sierra had been taken on that date by Hanrahan to           Los Angeles.  On December 10, 2006, when Hanrahan landed in L.A. with Sierra, he issued a list of demands that plaintiff had to comply with in order to see her daughter, one of which was that she would not appeal the Hague ruling against her.  Defendant Slutes failed to explain to Plaintiff her options for an appeal of Judge Collins' order.  Nor did Slutes tell Plaintiff whether she should or should not appeal (Pltf. SSOF, ¶24-28).

Defendant Slutes spoke to Judge Colllins' clerk and to Judge Collins himself and confirmed that Judge Collins wanted the Plaintiff to have the child for 15 days after December 8, 2006.  Yet Slutes did not ask Judge Collins to stop Hanrahan from leaving the country with the

child and flying to Australia before the 15 day period had run out, even though Slutes was informed that Hanrahan had grabbed the child and gone to Los Angeles with the child so he could fly to Australia with her (Pltf. SSOF, ¶37).

Plaintiff's expert witness, attorney Gourvitz, is a certified specialist in matrimonial law (Pltf. SSOF, ¶37).  Attorney Gourvitz opined that plaintiff and Hanrahan had the shared intent to come to the United States for an indefinite period of time, some period of time, which in his professional opinion was enough of an intent to show a shared intent to stay in the United States (Pltf. SSOF, ¶40).

Attorney Gourvitz opined that Slutes, in the Hague case, should have objected to a trial on the merits being held at the first hearing for a TRO, two weeks into the case without discovery or trial preparation.  Attorney Gourvitz opined that Slutes should have gone into Hanrahan's intent to sell everything and leave Australia in the Hague case.  The expert also opined that Slutes, in the Hague case, did not present the eveidence correctly and that Plaintiff was not properly prepared to testify.   Attorney Gourvitz opined that Slutes, in the Hague case, did not present an explanation of the round-trip ticket that was available.  Indeed, Plaintiff's evidence was that she was only going to use the return ticket to Australia if Hanrahan dealt with his anger management problems.  But the return trip to Australia was to attend a wedding for Hanrahan's family.  It was not Plaintiff's intention to use the round-trip ticket when she came to the United States in July of 2006 (Pltf. SSOF, ¶11).

Attorney Gourvitz opined that had Slutes presented the evidence properly at trial, that Plaintiff would have probably been successful at the Hague trial (Pltf. SSOF, ¶41-43).

The Australian court found as a fact, based on pre-Hague trial evidence, that the mother and her family members were verbally and physically abused by Hanrahan on a regular basis and mother did things to please him and avoid his abuse, such as hoping he would agree to dual

citizenship in the United States.  Hanrahan abused the child as well when under the influence of alcohol and drugs.  Hanrahan suggested going to the United States in 2006 so he could find work in California.  Plaintiff told Hanrahan she wanted to return to the United States to obtain her Master's Degree.

The Australian judge specifically found that Judge Collins was not informed about material evidence in the Hague case regarding the mother's statements and Hanrahan's knowledge of the mother's intent to go to and stay in the United States.  The Australian judge concluded that Hanrahan deliberately delayed the Hague case to prevent his knowledge of Plaintiff's intent from coming forward.

The Australian judge expressed doubt as to whether Plaintiff put on an "actual case" at the Hague Convention trial:

> "…The prospects of reconciliation must have disappeared on 24 November 2006 when the mother was served with the initiating documents for the Hague Convention proceedings. **The mother's case at these proceedings was not made clear to me. The judgment details the Court's conclusions of fact but not necessarily the mother's actual case, if any, in opposing an order for Sierra's return.** The judgment seems to deal with theoretically possible defences."

The Australian judge specifically found that Hanrahan improperly took Sierra in Tucson and deprived Plaintiff of her 15 day period to be with the child (Pltf. SSOF, ¶47-51).

### I.     THE ARIZONA PROXIMATE CAUSE STANDARDS FOR LEGAL MALPRACTICE CASES PRECLUDE SUMMARY JUDGMENT.

A.     Plaintiff's Expert Testimony Must Be Assumed True for Summary Judgment Purposes.

Defendants discuss, in general terms, the summary judgment standards that apply in civil cases. However, it is important to emphasize that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." ." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).     Therefore, **"[t]he evidence of the non-movant is to be believed, and all**

**justifiable inferences are to be drawn in [its] favor" at the summary judgment stage**. *Id.* at 255 (emphasis added)..

In effect, defendants are asking this Court to ignore the supplemental expert opinions of plaintiff's expert witness, even though the Supreme Court has commanded that the non-movant's evidence "**is to be believed, and all justifiable inferences are to be drawn in [its] favor" at the summary judgment stage**. *Id.* at 255 (emphasis added)..

*Anderson v. Liberty Lobby* and its progeny require that the expert evidence of the plaintiff be believed, at the summary judgment stage of the case, and that all inferences from the expert's opinions be assumed true. Therefore, the causation opinions of plaintiff's expert must be credited at this stage of the case, and cannot be swept away by an "out-of-context" quote from the expert's deposition, which deposition was taken before the Australian court issued its decision, and before the plaintiff's expert supplemented his report.

The causation principles applied in legal malpractice cases in Arizona were discussed by the Arizona Court of Appeals in *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn,* 184 Ariz. 120, 131-32, 907 P.2d 506, 517-18 (App.1995), where the Court of Appeals ruled that a jury could have reasonably concluded that, but for the attorney's legal malpractice, the client could have significantly improved the result in the underlying litigation. The Court of Appeals in *Hyatt* held that:

> "To recover compensatory damages in a legal malpractice action the plaintiff must prove that but for the attorney's negligence, the prosecution or defense of the original action would have been successful. *Asphalt Engineers, Inc. v. Galusha,* 160 Ariz. 134, 136-37, 770 P.2d 1180, 1182-83 (App.1989). **If there is any evidence which would permit reasonable jurors to make such a finding, proximate causation is a jury question**. *Tennen v. Lane,* 149 Ariz. 94, 97, 716 P.2d 1031, 1034 (App.1985). The jury views the first suit-"the case within the case"-from the standpoint of what a reasonable judge or jury would have decided but for the attorney's negligence. *Molever v. Roush,* 152 Ariz. 367, 375, 732 P.2d 1105, 1113 (App.1986); *Phillips v. Clancy,* 152 Ariz. 415, 418, 733 P.2d 300, 303 (App.1986)."

184 Ariz. at 131-32, 907 P.2d at 517-18 (emphasis added).  Plaintiffs submit that the above-quoted expert deposition testimony, plaintiff's supplemental expert report, the evidence cited in that expert report and the Australia court decision, either singly or in combination with one another, satisfy the "any evidence" standard.

In this legal malpractice case, "injury" can also mean " 'the loss of a right, remedy or interest, or the imposition of liability.' " *Cecala v. Newman,* 532 F.Supp.2d 1118, 1134 (D.Ariz.2007) (quoting 3 Ronald E. Mallen & Jeffery M. Smith, *Legal Malpractice* § 20:1 at 3 (2007)).  Plaintiff lost the opportunity to present her entire facts and circumstances to the Hague Convention court.  Therefore, it remains for the fact-finder to determine what the outcome should have been in the "case within a case." *Phillips v. Clancy,* 152 Ariz. 415, 418, 733 P.2d 300, 303 (App.1986).  "The question what outcome should have followed if [the] defendant [had conducted a proper investigation, presentation (or exclusion) of evidence, or other steps bearing on a decision based on facts remains a question of fact ..." *Id.*

In *Phillips v. Clancy,* 152 Ariz. 415, 418, 733 P.2d 300, 303 (Ct.App.1986), the Court of Appeals applied the "case within the case" doctrine.  *Phillips,* 152 Ariz. at 418, 733 P.2d at 303. The Court of Appeals held that, when malpractice occurred at the trial level, the attorney's negligence either precluded a trial on the merits or prevented the client's case from being presented according to professional standards. *Id.* at 421, 733 P.2d at 306. Therefore, in such a malpractice claim, the issue is "what the outcome *should* have been if the issue had been properly presented." *Id.* at 421-22, 733 P.2d at 306-07. The impact of the lawyer's negligence in the underlying action is judged by an objective standard: "what a reasonable judge or jury would have decided, but for the attorney's negligence." *Id.* at 418, 733 P.2d at 303."

Defendants incorrectly posit this standard as presenting a legal issue as to what Judge Collins would have "necessarily" ruled to a certainty.  Actually, the issue in this case is, on an

objective basis, what a reasonable judge would have ruled if presented with the evidence, the facts and circumstances that could have been presented and that were presented to the judge in Australia.   Judges make legal decisions based on the evidence presented, and that is what defendants failed to present when they failed to object to the TRO hearing in the Hague Convention case being converted into a full-blown trial on the merits of the case, without discovery and without preparation for trial.

The fact-based nature of the inquiry is illustrated by Judge Silver's summary judgment opinion in *Energex Enterprises, Inc. v. Shughart, Thomson & Kilroy, P.C*., 2006 WL 2401245 (D. Ariz. 2006), where Judge Silver denied summary judgment, and rejected similar "it would have happened anyways" arguments in summary judgment motions in legal malpractice cases:

> "The general rule is that the question of causation is one of fact for a jury except in those instances where no reasonable persons could disagree."*Molever v. Roush,* 152 Ariz. 367, 732 P.2d 1105, 1112 (Ariz.Ct.App.1987); *see also Robertson v. Sixpence Inns of America, Inc.,* 163 Ariz. 539, 789 P.2d 1040, 1047 (Ariz.1990). Arizona courts have relied on this principle and refused to grant summary judgment on the issue of causation in legal malpractice cases similar to the current case. In *Reed v. Mitchell & Timbanard, P.C.,* 183 Ariz. 313, 903 P.2d 621 (Ariz.Ct.App.1995), the plaintiff brought a legal malpractice action against her divorce attorneys alleging negligent failure to adequately secure a promissory note from her ex-husband. The ex-husband had defaulted on the note and the plaintiff argued that her attorneys' failure to secure the note with all available assets prevented her from collecting on the note and constituted malpractice. The husband's failure to pay the note was the most obvious cause of plaintiff's harm and the attorneys moved for summary judgment based on their belief that the plaintiff would be unable to show that *but for* their negligence she would have been able to collect the money from her ex-husband. *Reed,* 903 P.2d at 625. The appellate court held that the plaintiff had presented sufficient evidence that the attorneys' actions had caused her harm to survive summary judgment; causation was a fact issue for the jury. *Id.* at 626. Similarly, in *Tennen v. Lane,* 149 Ariz. 94, 716 P.2d 1031 (Ariz.Ct.App.1986), the plaintiff brought a legal malpractice claim against an attorney who had assisted her ex-husband in fraudulently procuring her consent to a property agreement. The attorney argued that what would have occurred absent plaintiff's fraudulently obtained consent was speculation because the husband could have disposed of certain property even without obtaining the plaintiff's consent. *Id.* at 1033. The appellate court reversed the directed verdict entered in favor of the attorney, finding that a question of fact existed whether the attorney's actions were "a proximate cause of damage to the [plaintiff]," regardless of the potentially more culpable actions by the ex-husband. *Id.* at 1034. Applying these cases to the current situation, there is a disputed issue of fact

whether the allegedly negligent drafting of the settlement agreement was a proximate cause of damage to Plaintiffs….”

In his supplemental expert report, plaintiff's expert, attorney Gourvitz, an expert in Hague Convention cases, opines as follows on proximate cause:

"I set forth previously that the Article 13b defense was more problematic and involves proving a grave risk as a defense to the child being returned. Our Federal Courts have been very wide in their interpretation of what constituted grave risk *from* a concept that it should be "narrowly drawn" to a situation where a child is returned to an "intolerable situation" to decision where grave risk has been defined as physical or psychological harm~ inconvenience and hardship and eliminating a certain economic and educational situations. See *Feder v. Feder*, 63 F.3d at 226 as compared to *Baxter v. Baxter*, 423 F.3d at 373 (3d *Cit.* 2005) and *Blondin v. Dubois*, 238 F.3d at 162 (2d Cir. 2001). The Judge's decision revealed many instances of domestic violence which were known at the time, able to be presented and which was not brought up in the original trial, which were determinative of the Court's decision in Australia, and could have been convincing to the Federal Court if presented to prevent the return of the child….The Federal Court's decision stated that this defense fails because "no credible evidence was presented that Sierra will be physically harmed by William or that William will subject Sierra to psychological harm." None could be decided because none was presented. See page 1.7, infra., "Grave Risk".

The Federal Court, on page 6 of its decision as to whether or not to reopen evidence after the trial noted that the Court had specifically explained its purpose and therefore the Court found that each side had a chance to fully present their positions at that time. Mr. Slutes had not. **The Australian Court rejected Mr. Hanrahan's position that when he left the United States in July, he expected his wife to return. to Australia "as planned on September 1, 2006". The Court stated that his cross examination confirmed that Ms. Silver had planned to remain in the United States….**

The Court concluded that it was probably the intention of the parties in January of 2006 to sell the land and to emigrate to the United States. The Court noted that it is also clear that by May 13, 2006 the father had decided to sell the kayaking business because he advertised it for sale on that date, and continued to advertise it until July 18, 2006. The land was sold and the kayaking business was not.

As I noted in my original report, this area of inquiry should have been explored by Mr. Slutes, but was not.

(Gourvitz Supplemental Report, Pltf. Ex. #5, at pp. 7, 8, 16).

A.  This Court Must Also Assume That Plaintiff's
<u>Non-Expert Testimony Is True for Summary Judgment Purposes.</u>

In Arizona, expert testimony may be required to establish the *standard of care* and deviations from that standard; but expert testimony is not required to show *causation* of a resulting injury. *See Baird v. Pace,* 156 Ariz. 418, 420, 752 P.2d 507, 509 (Ct.App.1987). In *Baird,* the Arizona Court of Appeals, after determining that plaintiff had established the standard and breach of it, then analyzed defendant's argument that even if he was negligent, that such negligence was not the proximate cause of plaintiff's injury. *Id.* at 422, 752 P.2d 507, 752 P.2d at 511. The Court of Appeals held that the trial court properly submitted the issues to the jury. *Id.* at 136, 770 P.2d at 1182.  The case stands for the proposition that causation is an element separate from duty and breach, and expert testimony is not required for causation. After a plaintiff first establishes duty and breach, often through expert testimony in a professional negligence action, a court may then submit the action to the jury to determine factual issues and the remaining elements.

To be sure, a plaintiff must show that plaintiff's causation evidence demonstrates "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."  *See Purcell v. Zimbelman,* 18 Ariz.App. 75, 82, 500 P.2d 335, 342 (1972); *see also Tennen v. Lane,* 149 Ariz. 94, 96-97, 716 P.2d 1031, 1033-34 (Ct.App.1985).  But as noted above, if there is any evidence which would permit reasonable jurors to make such a finding, then causation becomes a jury question. *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn,* 184 Ariz. 120, 131, 907 P.2d 506, 517 (Ct.App.1995) (citing *Tennen,* 149 Ariz. at 97, 716 P.2d at 1034).

Plaintiff herself testified to the consequence of defendants' failure to prepare her to testify and to otherwise prepare for the Hague trial.  There is other non-expert testimony and evidence that supports the proposition that defendants' negligence was, more probably true than

not true, the reason plaintiff did not prevail at the Hague Convention case (Pltf. SSOF, ¶43).

## II.    THE ARIZONA PROXIMATE CAUSE STANDARDS FOR LEGAL MALPRACTICE CASES PRECLUDE SUMMARY JUDGMENT.

Defendants claim that the Hague Convention cases support their position.  They do not given the evidence set forth above that should have been presented at the Hague hearing, but was not.

### A.   Habitual Residence and 13A Acquiescence.

Defendants ignore the supplemental expert report of plaintiff's expert, quoted above on pages 2-3 of this Response, that contains the expert's opinion, based upon the facts and circumstances set forth in the findings of the judge in Australia, that "**Australia was not the habitual residence of the parties**…"  (emphasis added).   That evidence cannot be ignored or disbelieved on this motion for summary judgment.   Such an approach is not unusual in Hague cases where, as here, an infant was involved, not an older child.  Thus, in *Whiting v. Krassner*, 391 F.3d 540 (3rd Cir. 2004), a case involving very young children, Canada was held to be a one-year-old child's "habitual residence" immediately before the father removed the child to the United States, even though the child had been in Canada only two months and couple's shared intent was only for a limited stay for the child in Canada.   Similarly, in *Bustamente v. Serrano-Figueroa*, 207 F.Supp.2d 1205 (D. Colo. 2002), the District Court held that for purposes of determining a child's habitual residence under the Hague Convention on International Child Abduction, where the duration of a young child's stay in a foreign country is intended to be indefinite, the habitual residence of a child is usually in that foreign country.  See also, *Zuker v. Andrews*, 2 F.Supp.2d 134 (D.Mass.1998), *affirmed*, 181 F.3d 81.

Plaintiff's position is consistent with Ninth Circuit authority, because "a determination of "habitual residence" under the Convention is primarily factual…" *Mozes v. Mozes*, 239 F.3d 1067, 1073 (9th Cir. 2001).  The essence of this legal malpractice case is that defendants failed to

present all of the facts and circumstances to the Hague judge because the case went to trial when it was two weeks old, at a hearing on the Motion for TRO.

B.   Grave Risk Exception in 13(b).

Article 13(b) of the Hague Convention allows a court to deny return of a child to the habitual residence if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Simcox v. Simcox*, C.A.6 (Ohio) 2007, 511 F.3d 594; 42 U.S.C. § 11603(e)(2)(A).  Defendant Slutes admitted at deposition he did not consider the grave risk exception.  The evidence that should have been admitted is set forth above. That evidence should have been properly presented, as plaintiff's expert testified.

WHEREFORE, Plaintiff, ITORYE TAMAR SILVER, denying the defendants' Motion for Summary Judgment.

ITORYE TAMAR SIVLER

By: /s/Philip J. Nathanson

Philip J. Nathanson
THE NATHANSON LAW FIRM
8765 E. Bell Rd., Suite 101
Scottsdale, AZ  85260

*Attorney for the Plaintiff*

1

2

3

**<u>CERTIFICATE OF SERVICE</u>**

4

I, Philip J. Nathanson, an attorney, certify that I caused a copy of this Motion to be served upon

5

the above named parties, electronically, by filing the same with the District of Arizona CM-ECF

6

online system on February 11, 2011.

7

/s/   Philip J. Nathanson

8

Philip J. Nathanson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28