Philip J. Nathanson    Arizona State Bar #013624
THE NATHANSON LAW FIRM
8765 E. Bell Rd. – Suite 101
Scottsdale, AZ  85260
(480) 419-2578
(480) 419-4136
*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| ITORYE TAMAR SIVLER,<br><br>                    Plaintiff,<br><br>TOM SLUTES and SLUTES, SAKRISON & ROGERS, P.C.,<br><br>                    Defendants. | No. 4:08-cv-00640-FRZ<br><br>**PLAINTIFF'S SEPARARATE STATEMENT OF FACTS IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.** |

Plaintiff, ITORYE TAMAR SILVER, by and through her attorney, PHILIP J. NATHANSON of THE NATHANSON LAW FIRM,, submits this Separate Statement of Facts ("SSOF") in Opposition to the Motion for Summary Judgment filed by Defendants,    TOM SLUTES and SLUTES, SAKRISON & ROGERS, P.C.:

**PLAINTIFF – ITORYE TAMAR SIVLER DEPOSITION**

1. Plaintiff, ITORYE TAMAR SIVLER, began her career as a school teacher in September of 2001 (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 26-27).

2. Plaintiff met her child's father, Mr. Hanrahan, on a trip to New Zealand in late 2003 (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 27-28).

3. Initially, Plaintiff and Hanrahan worked together in New Zealand  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 28-29).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

4.   After Plaintiff and Hanrahan left New Zealand, then first came to America and then they decided to be in Australia "for awhile."  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 28-29).

5.   Hanrahan and Plaintiff went to Australia in July of 2004 only because he had a three-month electronic visa.  Initially they did not live anywhere in Australia and actually traveled around because he was a guide and backpacker (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 29-30).

6.   Except for a three month trip to New Zealand, Plaintiff and Hanrahan lived together in Australia from July 2004 to July 2006  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 30-31).

7.   The daughter of Plaintiff and Hanrahan, was born on December 13, 2005 (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 31-32).

8.   Plaintiff came to Tucson after Hanrahan  left New York and returned to Australia, to find a job in Tucson because plaintiff's mother had property in Tucson (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 32-34).

9.   In August of 2006, Plaintiff came to Tucson to find a job, when she found at Southside Community School in August 2006, for $34,000 per year, several blocks from where her mother was living (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 32-34).

10. Plaintiff and Hanrahan discussed Hanrahan returning to Tucson for the holidays (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 34-35).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

11. Plaintiff was only going to use the return ticket to Australia if Hanrahan dealt with his anger management problems.  But the return trip to Australia was to attend a wedding for Hanrahan's family.  It was not Plaintiff's intention to use the round-trip ticket when she came to the United States in July of 2006  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 35-36, 64).

12. Plaintiff initially met with defendant Slutes at her mother's Tucson home on November 27, 2006, and showed Slutes the Hague Convention papers she was served with.  Attorney Slutes told Plaintiff he had never handled a Hague Convention case before this one  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 39-44).

13. Plaintiff initially retained another attorney before defendant Slutes, but then had the retainer she had paid to the other attorney transferred to Slutes when he told Plaintiff that he had a team of people working on the case and that he felt he had a strong defense  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 53-54).

14. Plaintiff met with defendant Slutes on November 30, 2006, and then met with Slutes' partner, Kathleen Rodgers, on December 1, 2006.  Also on the latter date, Slutes met with plaintiff and prepared an affidavit for plaintiff  in opposition to the Hague Convention case.   Plaintiff gave Rodgers her paperwork and evidence in that December 1st meeting (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 55-58).

15. Plaintiff was not told by defendant Slutes at their December 1, 2006, meeting that the upcoming December 4, 2006, was going to be a hearing like the hearing that transpired.  She was told it was a "technicality" and the judge would just give another date

for the case at the December 4, 2006, hearing.  Defendant Slutes told her the December 4, 2006, was not going to be the hearing where the Hague case was decided.  Plaintiff was not prepared to give any testimony of any kind for the then upcoming December 4, 2006, hearing  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 59-62).

16.   The last time Plaintiff met with defendant Slutes, before the December 4, 2006, hearing, was at their December 1, 2006, meeting  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 62-63).

17.   When asked what defendant Slutes failed to do, Plaintiff, opined that he was not prepared for a full-blown hearing;  he did not prepare her to testify;  he did not cite any case law other than the case suggested to him by Plaintiff and he raised the best interest of the child standard which is not the standard in a Hague case (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 64-67).

18.   Two days after the December 4, 2006, hearing, defendant Slutes filed a motion to reopen the evidence.  Plaintiff testified that had she known the December 4, 2006, hearing was going to be a full-blown trial, she would have wanted the witnesses called who were listed in the motion to reopen the evidence.  Plaintiff believed it was not emphasized that when the child is as young as this child was, then the habitual residency was the location of the primary caregiver (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 70-72).

19.   There were additional witnesses in Australia who should have been called for Plaintiff who knew about the nomadic nature or her relationship and the discussions between Plaintiff and Hanrahan about moving to America.  Additionally, both of her

stepfathers and other family members and friends in New York should have been called as witnesses  to discuss the rocky relationship and what had occurred in New York while Plaintiff and Hanrahan were there.   Plaintiff told defendant Slutes about these other witnesses prior to the December 4, 2006, hearing  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 73-77).

20.  Slutes did not object to the case going forward as a trial at the first hearing on the motion for a TRO.  Slutes did not call as witnesses the Plaintiff's family members who were present in the courtroom.   Hanrahan's mother was called as a witness at trial (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 78-80).

21.  Slutes did not argue or offer evidence on the grave risk exception, even though Hanrahan was abusive towards Plaintiff, could not properly care for their daughter, bordering on negligent parenting  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 80-86).

22. Defendant Slutes told Plaintiff that she had 15 days with her daughter, Sierra, after Judge Collins' December 8, 2006, ruling.  But Slutes did not tell her to refrain from handing over the passports or the child until any ambiguity was resolved regarding the order.  It appeared that the second order, which referred to "custody" contradicted the first 15 day order.  The second order and confusion resulted in Plaintiff being denied access with her child (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 88-90, 103).

23. On December 12, 2006, Slutes filed a motion to clarify the December 8, 2006, order.  And in that motion, Slutes said it was his understanding that the intent  of the order was to allow Plaintiff to have custody for 15 days and then turn the child over to Mr.

-5-

Handrahan who would then have custody of the child and return to Australia.  Then the motion says, unfortunately, the attorney for Mr. Handrahan  interpreted the order as saying Mr. Handrahan was entitled to immediate custody and he so instructed his client. And as a result Mr. Handrahan, over the weekend, told Ms. Silver that he wanted to see the child for one hour and then  refused to give the child back claiming he was entitled to custody (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 91-92; 139-141).

24. On December 10, 2006, Mr. Hanrahan took Sierra for what he told Plaintiff would be a short picnic, and instead he fled the State along with his mother and Sierra. That Plaintiff discovered that Sierra had been taken on that date by Hanrahan to Los Angeles (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 91-92).

25. On December 10, 2006, when Hanrahan landed in L.A. with Sierra, he issued a list of demands that plaintiff had to comply with in order to see her daughter, one of which was that she would not appeal the Hague ruling against her  (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 91-94).

26.  The lease in Australia had three months left on it, the period for which it had been renewed (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 105).

27.  Plaintiff suffered a loss of income and other damages (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 110-113, 117).

28.  Defendant Slutes failed to explain to Plaintiff her options for an appeal of Judge Collins' order.  Nor did Slutes tell Plaintiff whether she should or should not appeal (Ex. #1, 5/14/10, Dep. of Plaintiff, at pp. 136-139).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## **DEFENDANT – TOM SLUTES DEPOSITION**

29.  Defendant Slutes had  never done a Hague convention case before this case (Ex. #2, 8/20/10, Dep. of Defendant Slutes, at pp. 8).

30.  Defendant Slutes did not believe that the exceptions to a Hague convention case applied.  Slutes admitted that "he would have never thought" to raise the harm to the child exception  (Ex. #2, 8/20/10, Dep. of Defendant Slutes, at pp. 23, 26-27).

31.  Defendant Slutes was served with a Motion for TRO (Ex. #2, 8/20/10, Dep. of Defendant Slutes, at pp. 27-28).

32. Defendant Slutes filed a Response to the Motion for TRO, but did not answer the Hague Petition (Ex. #2, 8/20/10, Dep. of Defendant Slutes, at pp. 30-34).

33. Defendant Slutes knew there was a chance the December 4, 2006, hearing would go beyond the Motion for TRO into the merits of the case and the hearing of evidence (Ex. #2, 8/20/10, Dep. of Defendant Slutes, at pp. 34-40).

34.  On December 4, 2006, the clerk called the case as coming on to be heard on the motion for TRO.  Counsel for Hanrahan announced that he wanted the trial of the whole case heard on that first hearing for a TRO, a couple of weeks after suit was filed. Defendant Slutes did not object to the whole trial being heard on December 4, 2006 (Ex. #2, 8/20/10, Dep. of Defendant Slutes, at pp. 46-51).

35.   Defendant Slutes filed a Motion to Reopen the Evidence after the December 4, 2006, hearing (Ex. #2, 8/20/10, Dep. of Defendant Slutes, at pp. 56, 77-78).

36. Defendant research a motion for a stay pending appeal that was never filed (Ex. #2, 8/20/10, Dep. of Defendant Slutes, at pp. 60-62).

37. After the December 8, 2006, ruling, Hanrahan kidnapped the child and went to L.A.  Defendant Slutes spoke to Judge Colllins' clerk and to Judge Collins himself and confirmed that Judge Collins wanted the Plaintiff to have the child for 15 days after December 8, 2006.  Yet Slutes did not ask Judge Collins to stop Hanrahan from leaving the country with the child and flying to Australia before the 15 day period had run out, even though Slutes was informed that Hanrahan had grabbed the child and gone to Los Angeles with the child so he could fly to Australia with her (Ex. #2, 8/20/10, Dep. of Defendant Slutes, at pp. 63-73).

**PLAINTIFF'S EXPERT – ELLIOT H. GOURVITZ, ESQ.**

38. Attorney Gourvitz is a certified specialist in matrimonial law (Ex. #3, 8/23/10, Dep. of Pltf. Expert, Gourvitz, at pp. 6).

39.  60% of Attorney Gourvitz's cases are custody cases, with 30% of those in the area of removal or abduction (Ex. #3, 8/23/10, Dep. of Pltf. Expert, Gourvitz, at pp. 11).

40. Attorney Gourvitz explained the shared intent of Plaintiff and Hanrahan:

"…you must also look at the particular facts and circumstances and background of the individuals that are concerned, and what their history was.  Both of these two people, to some degree, were nomadic in moving from place to place within Australia, New Zealand, as well as the United States.  It is my impression that, even though there wasn't an intention to stay permanently in the United States, there was a fixed intent to give it a shot; to go there for a period of time – an unspecified period of time -- which was exhibited by the fact that they did go, in fact, there – and they did abandon everything that they had in the previous -- in Australia in order to be there.

-8-

And I believe that that is enough for them to -- what you call it -- have a shared intent.  Doesn't have to necessarily be written -- what you call it -- on paper or etched in stone.   But looking at all of the circumstances all together, I would believe that their intention at that time was to stay there for some period of time, which is enough of an intent for them to basically say that this was their shared intent to go there."

(Ex. #3, 8/23/10, Dep. of Pltf. Expert, Gourvitz, at pp. 23-24, 42, 44-45).

41.   Attorney Gourvitz opined that Slutes should have gone into Hanrahan's intent to sell everything and leave Australia in the Hague case  (Ex. #3, 8/23/10, Dep. of Pltf. Expert, Gourvitz, at pp. 34-35).

42.   Attorney Gourvitz opined that Slutes, in the Hague case, did not present the eveidence correctly and that Plaintiff was not prepared to testify  (Ex. #3, 8/23/10, Dep. of Pltf. Expert, Gourvitz, at pp. 40-41; 55).

43.   Attorney Gourvitz opined that Slutes, in the Hague case, did not present an explanation of the round-trip ticket that was available (Ex. #3, 8/23/10, Dep. of Pltf. Expert, Gourvitz, at pp. 47-50).

42.   Attorney Gourvitz opined that Slutes, in the Hague case, should have objected to a trial on the merits at the first hearing for a TRO  (Ex. #3, 8/23/10, Dep. of Pltf. Expert, Gourvitz, at pp. 69-71; 75, 77-78).

43.   Attorney Gourvitz opined that had Slutes presented the evidence at a full hearing, that Plaintiff would have probably been successful:

"Q.      So are you able to tell us today, had all that work been done, had all the ducks been lined up, what the evidence would have been that would have been presented that would have –

A.     I can't, without the examination, but I can tell you that, **if it was presented properly, that there was a probability that she would have been successful.**"

(Ex. #3, 8/23/10, Dep. of Pltf. Expert, Gourvitz, at pp. 80-82)(emphasis added).

44.   Attorney Gourvitz opined that you cannot take the "hope" evidence out of context and make it the sole issue  (Ex. #3, 8/23/10, Dep. of Pltf. Expert, Gourvitz, at pp. 90).

45.   Attorney Gourvitz opined that his Adan case was the controlling authority on the grave risk exception  (Ex. #3, 8/23/10, Dep. of Pltf. Expert, Gourvitz, at pp. 108-109; 113-115).

## AUSTRALIAN COURT FINDINGS AND REASONS FOR JUDGMENT

46.   The mother was, prior to the pregnancy, seriously considering a return to the United States (Ex. #4, 9/13/10, Reasons for Judgment #30, Australian Court, at pp. 8).

47.   The mother and her family members were verbally and physically abused by Hanrahan on a regular basis and mother did things to please him and avoid his abuse, such as hoping he would agree to dual citizenship in the United States.  Hanrahan abused the child as well when under the influence of alcohol and drugs  (Ex. #4, 9/13/10, Reasons for Judgment ##32-35, 41-47, 64-75 Australian Court, at pp. 9-11, 12-13, 17-19).

48.   The suggested going to the United States in 2006 so he could find work in California.  Plaintiff told Hanrahan she wanted to return to the United States to obtain her Master's Degree  (Ex. #4, 9/13/10, Reasons for Judgment #49, Australian Court, at pp. 9-10).

49.   The Australian judge specifically found that Judge Collins was not informed about   material evidence in the Hague case regarding the mother's statements and Hanrahan's knowledge of the mother's intent to stay in the United States.  The Australian judge concluded that Hanrahan deliberately delayed the Hague case to prevent his knowledge of Plaintiff's intent from coming forward   (Ex. #4, 9/13/10, Reasons for Judgment #89-96, 98, Australian Court, at pp. 22-24).

50.   The Australian judge also found that:

"97.   The prospects of reconciliation must have disappeared on 24 November 2006 when the mother was served with the initiating documents for the Hague Convention proceedings. **The mother's case at these proceedings was not made clear to me. The judgment details the Court's conclusions of fact but not necessarily the mother's actual case, if any, in opposing an order for Sierra's return.** The judgment seems to deal with theoretically possible defences."

(Ex. #4, 9/13/10, Reasons for Judgment #97, Australian Court, at pp. 24-25)(emphasis added).

51.   The Australian judge specifically found that Hanrahan improperly grabbed Sierra in Tucson and deprived Plaintiff of her 15 day period to be with the child  (Ex. #4, 9/13/10, Reasons for Judgment #99-111, Australian Court, at pp. 25-28).

ITORYE TAMAR SIVLER

By: /s/Philip J. Nathanson

Philip J. Nathanson
THE NATHANSON LAW FIRM
8765 E. Bell Rd., Suite 101
Scottsdale, AZ  85260

*Attorney for the Plaintiff*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

☒      I hereby certify that on February 11, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants for this case.

s/ Philip J. Nathanson

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26